UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ROBERT C. SCHOFIELD,          ) | |
|     Plaintiff,          ) | |
|                     ) | |
|     v.          ) | CAUSE NO.: 2:04-CV-520-PRC |
|                     ) | |
| UNITED STATES STEEL CORP.,          ) | |
|     Defendant.          ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant United States Steel Corporation's Motion for Partial Summary Judgment to Limit Potential Damages [DE 46], filed by Defendant United States Steel Corporation on August 23, 2005. For the following reasons, the Court denies the Motion for Partial Summary Judgment to Limit Potential Damages.

**PROCEDURAL BACKGROUND**

The Plaintiff, Robert C. Schofield, filed a Complaint against the Defendant, United States Steel Corporation ("USS"), on December 14, 2004. In his Complaint, Schofield alleges that USS infringed and continues to infringe upon his United States Patent No. 4,770,095 ("the '095 patent"), entitled "Squeeze Roll and Actuator Assembly Utilizing Inflatable Bags," through USS's use of pneumatic or pressure actuators to control the movement of a roll assembly for the manufacture of sheet material. As relief, Schofield requests damages adequate to compensate him for USS's infringement as well as treble damages, prejudgment interest, and attorney's fees, as well as a permanent injunction prohibiting further infringement of the '095 patent.

USS filed its Answer and Affirmative Defenses on February 9, 2005. On June 28, 2005,

USS filed a Motion to Amend/Correct Answer to Complaint and Affirmative Defenses and Counterclaim. The Court granted USS's Motion to Amend/Correct on June 20, 2005, and on July 1, 2005, USS filed its First Amended Answer to Complaint and Affirmative Defenses and Counterclaim. On July 14, 2005, Schofield filed a Reply to USS's First Amended Answer, Affirmative Defenses, and Counterclaim.

On August 23, 2005, USS filed its Motion for Partial Summary Judgment to Limit Potential Damages and supporting memorandum. Schofield filed his Response in Opposition to USS's Motion for Partial Summary Judgment on September 22, 2005. On October 7, 2005, USS filed its Reply in Support of its Motion for Partial Summary Judgment to Limit Potential Damages.

On August 30, 2005, USS filed a Second Motion to Amend/Correct Answer, Affirmative Defenses and Counterclaim, which the Court granted on October 19, 2005. USS filed its Second Amended Answer to Complaint, Affirmative Defenses, and Counterclaim on October 20, 2005. On October 26, 2005, Schofield filed his Amended Answer to USS's Second Amended Answer, Affirmative Defenses and Counterclaim.

The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

2

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the nonmoving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir.

1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the nonmoving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must do more than raise some metaphysical doubt as to the material facts; the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the nonmoving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443. Specifically in regards to cross motions for summary judgment, "our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

**FACTUAL BACKGROUND**

The following are the facts viewed in the light most favorable to the non-moving party. Plaintiff Robert C. Schofield is an individual residing in Bayport, Florida. Defendant United States Steel Corporation is a corporation headquartered in Pittsburgh, Pennsylvania, with facilities operating in this district in East Chicago, Portage, and Gary, Indiana.

Schofield obtained the '095 patent in 1988. On November 1, 1990, Schofield entered into an agreement with Edward Schaming, through his companies known as S.A. Incorporated, and later as Controlled Fluids, Inc., whereby Schaming was licensed to sell actuators under the '095 patent. Schaming's license terminated effective April 20, 1994. As early as May 9, 1994, William Winkle, through his company Winkle Engineering, sold actuators that were licensed under the '095 patent. Winkle's license terminated on December 9, 2004.

On November 30, 1994, Schofield entered into a license agreement with National Steel Corporation ("National") that granted National a royalty-free, non-transferrable license for use of the actuators at its Portage Plant as well as any other National plant. USS became the owner and operator of the Portage Plant when it purchased National's assets from bankruptcy proceedings in June of 2003.

Prior to acquisition of the Portage Plant by USS, Schofield sent several letters to National regarding the patented actuators. In a May 9, 1998 letter, Schofield informed National that his "air bag actuator assembly" is the subject of U.S. Patent No. 4,770, 095. Pl. Br., Exh. Q. In a February 6, 2003 letter to Schofield, National stated, "This refers to our recent telephone conversation and to your letter of January 5, 2003 regarding the license granted to National Steel . . . under your U.S. Patent Nos. 4,770,095 and 4,928,589 . . . . National still maintains its position that the license under

5

your patents is not necessary." Pl. Br., Exh. R.  In a March 12, 2003 letter to National, Schofield stated, "I would like to have this issue of my Intellectual Property resolved with an equitable solution.  I would suggest the sale of this property by National might violate federal and state laws." Def. Br., Exh. 57.  The letter also proposed a modification of the license agreement to include a transferable license to the purchaser of National's plants.

After the acquisition of the Portage Plant by USS, Schofield sent several letters to USS.  In a July 8, 2003 letter to USS, Schofield asked for recovery of lost profits, as National's attorney had rejected "[Schofield's] offer of transferring the National Steel Agreement to U.S. Steel." Def. Br., Exh. 60.  The letter also requested that USS "divulge any usage of my intellectual property in their work places." *Id.*  In a September 15, 2003 letter to USS, Schofield requested an update in "the ongoing matter," and stated, "I believe we discussed the Midwest Steel agreement and the impending matter of my intellectual property usage in the then impending purchase of Midwest by [USS] sometime in March, 2003" but that "[t]here has been no answer to my correspondence." Def. Br., Exh. 64.  In an October 23, 2003 letter to USS, Schofield stated in part:

> While working for Mid West Steel, I invented, installed, perfected and patented a device that exacts precision force on wringer rolls allowing optimum roll life along with many other advantages . . . . I decided to sign a irrevocable, royalty free, non exclusive, and nontransferable agreement [with National] . . . . A clause in the Winkle agreement forces me to defend against patent infringement (enclosed). Phone and letters after March 2003 . . . informed both [USS and National] of the impending problem of this agreement and its transfer to [USS].  Since then there has been nothing done to rectify this matter . . . . My recent phone and correspondence have been ignored . . . . I am hoping your involvement would help facilitate a fairly prompt agreement to transfer my intellectual property to [USS].
> . . . .
> I am not an attorney or legal game player and am only seeking a fair and equitable agreement that will put this matter to rest.

Def. Br., Exh. 65.  In a December 15, 2003 letter to Schofield, USS stated in pertinent part:

6

> U.S. Steel has thoroughly reviewed the facts underlying your request for compensation for your two patents. Based on this review, U.S. Steel must respectfully deny your request. When U.S. Steel acquired the assets of National Steel, it succeeded to National's shop rights in the patents, which rights had been acknowledged in the 1994 License Agreement between National and you. U.S. Steel also succeeded to the usage rights granted to National through the License
> . . . .
> For all of the above reasons, U.S. Steel unfortunately must take the position that it owes you no compensation for use of the technology claimed in your two patents.

Pl. Br., Exh. S.

In addition to written communications between Schofield and USS, there were also phone conversations regarding the '095 patent between Schofield and representatives from USS as evidenced by Schofield's contemporaneous handwritten notes showing that he discussed the '095 patent with USS's in-house patent counsel, Ed Jones.

**ANALYSIS**

In its Motion for Partial Summary Judgment to Limit Potential Damages, USS argues that (1) any recovery for damages in this case is limited to the cost of a license under the '095 patent that was available on the open market to any willing customer at the time the alleged infringement began for $200 to $300 per actuator; (2) any recovery for damages in this case is limited in time to a date after the filing of the lawsuit on December 14, 2004, on account of Schofield's failure to satisfy the notice and marking requirements under 35 U.S.C. § 287; and (3) any recovery for damages in this case for infringement based on use of actuators at the Portage Plant must be excluded on account of the prior compensation of Schofield for that same infringement based on a license agreement between National and Schofield.

7

### A.  Cap on Damages Limiting Potential Recovery
### to Cost of Obtaining Non-infringing Actuators

USS argues that any recovery for damages is limited to the cost that USS would have paid for the right to use non-infringing actuators at its Gary Works plant in 1992, and at its Portage Plant in 2003.  Thus, USS seeks summary judgment capping a reasonable royalty award at the cost of obtaining a license under the '095 patent that was available when the alleged infringement began, from Shaming in 1992 for the Gary Works Plant and from Winkle in 2003 for the Portage Plant.  In response, Schofield asserts that the existence of a non-infringing alternative is but one factor to be considered in determining a reasonable royalty award.  Schofield claims that a reasonable royalty determination includes the consideration of many other factors, including the commercial realities that existed at the time of the infringement.  In addition, Schofield asserts that there is no evidence of a non-infringing alternative as he would never have entered into an agreement with USS had he known of USS's rampant infringement at the Gary Works and Portage Plants.  Moreover, had he known of the infringement, Schofield claims he would have quickly terminated the Shaming and Winkle licenses.  Furthermore, Schofield argues that evidence relating to the reasonable royalty determination presents fact issues for a jury to decide

The award of damages for patent infringement is governed by 35 U.S.C. § 284, which provides, "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.[1]  This Court has discretion both in selecting the methodology for and in calculating the damage

---

[1] The statute further provides that a court may receive expert testimony to aid in its determination of damages regarding what royalty would be reasonable under the circumstances.  35  U.S.C. § 284.  In addition, a court may increase actual compensatory damages by up to three times the amount assessed.  *Id.*

award. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996). There are two methods by which damages may be calculated under 35 U.S.C. § 284: 1) the determination of actual damages, namely, the profits the patentee lost from the infringement; and 2) where actual damages cannot be ascertained, the determination of a reasonable royalty. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983); *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, IP 96-1718, 2002 WL 1801525, at *72 (S.D. Ind. July 5, 2002); *see also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) ("A patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits"). Calculation of a reasonable royalty depends on the particular facts of each case. *Mahurkar,* 79 F.3d at 1579.

The reasonable royalty may be based upon an established royalty, if one exists, or otherwise upon a consideration of the results of a hypothetical negotiation between a willing licensor and a willing licensee at the time the infringement began. *Rite-Hite Corp.*, 56 F.3d at 1554 (endorsing the conceptual framework of a hypothetical negotiation between the patentee and the infringer as a means for determining a reasonable royalty); *Hanson*, 718 F.2d 1075 at 1078.

The determination of a reasonable royalty under the artificial conditions of the hypothetical negotiation is not an exact science, and "necessarily involves an element of approximation and uncertainty." *Cardiac Pacemakers, Inc.*, 2002 WL 1801525, at *72. Doubts about the amount should be resolved against the infringer. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983). "A key factor in determining the reasonable royalty in the hypothetical negotiation is the economic effects of non-infringing choices available to the infringer, such as stopping production, redesigning

its product to avoid infringement, or substituting some other non-infringing alternative." *Cardiac Pacemakers, Inc.,* 2002 WL 181525, at *74. The costs of such alternatives are important factors to consider in establishing a reasonable upper limit on a reasonable royalty. *Id.*

In *Grain Processing Corp. v. American Maize-Prod. Co.,* the district court found that the infringer's production cost difference between infringing and non-infringing products effectively capped the reasonable royalty award. 893 F. Supp. 1386, 1389-93 (N.D. Ind. 1995). The district court found that it cost only 2.3% more to make non-infringing products, and thus determined that when faced with a hypothetical offer to license the patent in suit, the accused infringer would not have paid more than a 3% royalty rate, a number which reflected the cost difference and other possible cost fluctuations. *Id.* at 1392-93. The district court concluded that if the patentee had insisted on a rate greater than 3% in the hypothetical negotiations, the accused infringer instead would have chosen to invest in producing a non-infringing alternative. *Id.* at 1393. This determination was not appealed, though the denial of lost profits was initially vacated and ultimately affirmed. *See Grain Processing Corp. v. American Maize-Prod. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

Evaluating the cost of non-infringing alternatives is also implicit in the factors used for calculating a reasonable royalty award as set forth in *Georgia-Pacific v. U.S. Plywood Corp.* In *Georgia-Pacific*, the district court summarized the leading cases regarding reasonable royalties by compiling the following list of facts relevant to the determination of a reasonable royalty:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured

  product may be sold.
  4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
  5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
  6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
  7. The duration of the patent and the term of the license.
  8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
  9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
  10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
  11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.
  12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.
  13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.
  14. The opinion testimony of qualified experts.
  15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

318 F. Supp. 1116, 1120 (S.D. N.Y. 1970). The Federal Circuit has recognized and often utilized the *Georgia-Pacific* factors. *See, e.g., Dow Chem. Co. v. Mee Indus.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) (recognizing the *Georgia-Pacific* factors and stating that on remand, "should [Plaintiff] prove infringement . . . , the district court should consider the so-called

*Georgia-Pacific* factors [internal citations omitted] in detail, and award such reasonable royalties as the record evidence will support"); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385-86 (Fed. Cir. 2001) (holding that the *Georgia-Pacific* factors provide ample evidentiary support for the trial court's determination of a reasonable royalty rate). The *Georgia-Pacific* factors assume that the infringer would agree to pay a royalty only if the rate would allow some prospect for a reasonable profit, though no guarantee of an actual profit. *Cardiac Pacemakers, Inc.*, 2002 WL 1801525, at *74 n.51.

    The Court cannot agree at this stage in the litigation with USS's contention that any recovery for damages in this case is limited to the cost of a license under the '095 patent at the time of the alleged infringement, or $200 to $300 per actuator. While the economic effects of non-infringing alternatives available to the infringer is a key factor in determining the reasonable royalty in the hypothetical negotiation, it is not dispositive. *See Cardiac Pacemakers, Inc.,* 2002 WL 181525, at *74. The other *Georgia-Pacific* factors should be considered in making the reasonable royalty determination. James Bean, patent counsel to National Steel and USS, also testified to the "innumerable" factors that are considered in patent licensing negotiations, including cost savings, customer acceptance, ease of production, technology that results in a better product, energy savings, faster production, maintaining the tracking of the steel strip, the skill of the opposing negotiators, whether the licensor was represented by patent attorneys, and the licensor's success in the past. Pl. Br., Exh. M.

    USS contends that it is not asking the Court to calculate a royalty rate in a hypothetical negotiation between Schofield and USS; however, it concedes that it is asking the Court to place "an upper limit on the amount of royalty determined in the hypothetical negotiation." Def. Reply

Br., p. 5.  As support for its request, USS cites to *Grain Processing Corp.* as an example of a case in which the district court capped the royalty award at the value of the noninfringing product.  *See Grain Processing Corp.,* 185 F.3d at 1347.  Although the Court is cognizant of the district court's methodology in calculating the royalty award in *Grain Processing Corp.,* the Court notes that the district court's calculations were made after a full trial on damages.  In contrast, in this case, USS appears to request that the Court perform only *part* of the royalty calculation (establishing the upper limit of the royalty) and in the context of a summary judgment motion.  The Court finds USS's request premature.

Further, there appears to be some issue of material fact as to whether a non-infringing alternative existed at the time of infringement.  Schofield alleges that USS hid the fact of its infringement of other actuators outside its Portage Plant from Schofield, including infringement at its Gary, East Chicago, and other plants, and that had he known of the infringement at the other plants, he would never have entered into an agreement with USS and would have quickly terminated the Shaming and Winkle licenses.  The Court denies USS's Motion for Partial Summary Judgment on the capping issue.

### B.  Actual Notice under 35 U.S.C. § 287

USS next argues that any recovery for damages is limited in time to a date after the filing of the lawsuit on December 14, 2004, because of Schofield's failure to satisfy the notice and marking requirements under 35 U.S.C. § 287.  USS alleges that Schofield failed to provide constructive or actual notice; however, because Schofield did not address the issue of constructive notice in his response brief, the Court finds that he has conceded his failure to

provide constructive notice, and thus the only issue in dispute is that of actual notice.

With regard to actual notice, USS alleges that Schofield failed to provide actual notice in compliance with the strict requirements of 35 U.S.C. § 287(a). As to the actuators at the Portage Plant, Schofield responds that he provided USS with actual notice prior to the commencement of this lawsuit through a series of letters dating from July 1998 until December 2003, as well as through "verbal communications" in the form of telephone conversations. As to actuators at other plants, Schofield responds that actual notice was not required because USS concealed its alleged infringement. USS replies that, regarding the actuators at the Portage Plant, the communications (letters and telephone conversations) "ma[de] no reference to activities that constitute infringement" or the possibility of filing suit for patent infringement. Def. Reply Br., p. 11. As to actuators at other plants, USS replies that 35 U.S.C. § 287 contains no exception for the alleged concealed infringement and the case law cited by Schofield is inapplicable.

35 U.S.C. 287(a) provides that:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them . . . may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C.A. § 287(a). The statute thus permits for notice of the infringement by either constructive or actual notice.

"Actual notice requires the affirmative communication of a specific charge of

14

infringement by a specific accused product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994); *see also Dunlap v. Schofield*, 152 U.S. 244, 247-48 (1894) (notice is an "affirmative act, and something to be done by [the patentee]"). However, "a specific charge of infringement" does not mean that the patentee must make an "unqualified charge of infringement." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1346 (Fed. Cir. 2001). Rather, "as long as the communication from the patentee provides sufficient specificity regarding its belief that the recipient may be an infringer, the statutory requirement of actual notice is met." *Id.*

In order to provide actual notice, the patentee must provide notice "of 'the infringement,' not merely notice of the patent's existence or ownership." *Amsted*, 24 F.3d at 187. Furthermore, it is irrelevant whether an accused infringer knew of either the patent or its own infringement. *Id.* (providing that "[t]he correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge or understanding of the infringer").

Although there are "numerous possible variations" of providing actual notice, the Federal Circuit has recognized that a patentee provides actual notice under § 287(a) when it informs the alleged infringer of "the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI Int'l. Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir.1997). It is not controlling whether the patentee threatens suit, demands cessation of infringement, or offers a license under the patent. *Id.* at 1470.

Compliance with the marking statute, 35 U.S.C. § 287(a), is a question of fact. *See Gart,* 254 F.3d at 1339 (Fed. Cir. 2001). Thus, the issue of notice is properly decided upon summary

15

judgment only when no reasonable jury could find that the patentee either has or has not provided actual notice to the "'particular defendants by informing them of his patent and of their infringement of it.'" *Id.* (quoting *Amsted Indus. Inc.*, 24 F.3d at 187 (Fed. Cir.1994) (quoting *Dunlap*, 152 U.S. at 247-48 (1894)).

The Court agrees with USS's contention that any notice given by Schofield to National Steel cannot be imputed to USS. Therefore, the Court confines its review to communications between Schofield and USS occurring after USS's acquisition of National Steel. The Court finds that Schofield's October 23, 2003 letter to USS is the most compelling evidence of actual notice of infringement. The letter states in pertinent part:

> While working for Mid West Steel, I invented, installed, perfected and patented a device that exacts precision force on wringer rolls allowing optimum roll life along with many other advantages . . . . I decided to sign a irrevocable, royalty free, non exclusive, and nontransferable agreement [with National] . . . . A clause in the Winkle agreement forces me to defend against patent infringement (enclosed). Phone and letters after March 2003 . . . informed both [USS and National] of the impending problem of this agreement and its transfer to [USS]. Since then there has been nothing done to rectify this matter . . . . My recent phone and correspondence have been ignored . . . . I am hoping your involvement would help facilitate a fairly prompt agreement to transfer my intellectual property to [USS].
> . . . .
> I am not an attorney or legal game player and am only seeking a fair and equitable agreement that will put this matter to rest.

Def. Br., Exh. 65. The October 23, 2003 letter provided a description of the product and its use and enclosed the Winkle agreement which contained the patent number. The letter further sought a proposal for an agreement to abate USS's infringement. The Court finds that a reasonable jury could find that Schofield provided actual notice to USS through his written communications.

Furthermore, there exists a genuine issue of material fact concerning whether verbal

communications in mid-2003 provided USS with actual notice of infringement. Schofield has provided handwritten notes indicating that he discussed the '095 patent with USS's in-house patent counsel, Ed Jones. Jones testified in his deposition that he received the patent and subsequently concluded that there was no infringement because the non-transferability clause in the National license did not apply. However, Jones also testified that what he believed Schofield was attempting to convey to him in a phone conversation was that USS did not have the right to continue to use Schofield's actuators. The Court denies USS's Motion for Partial Summary Judgment on the notice issue.

### C.  Potential Recovery Exhausted by Schofield's Prior Compensation

Lastly, USS argues that any potential recovery of damages for use of the actuators at the Portage Plant has been exhausted by Schofield's prior compensation for that use. Specifically, USS argues that Schofield received benefits from the license agreement with National such as enhanced validity of his patent due to the mere existence of the license agreement, and increased recognition of his product, as potential customers of Schofield's licenses were permitted to view the operation of the actuators at the Portage Plant. These benefits, USS argues, constitute compensation for the use of the actuators at the Portage Plant under the license agreement with National. In response, Schofield asserts that he never received any compensation from National Steel as a result of its use of his actuators. Schofield claims that USS has not put forth evidence that Schofield received any benefits under the license agreement. Moreover, Schofield alleges that the visitors that National agreed to show the actuators to, very likely became infringers.

The law of patent exhaustion is well established:

> The full extent of the monopoly is the *patentee's* "exclusive right to make, use, and vend the invention or discovery." The *patentee* may surrender his monopoly in whole by the sale of his patent or in part by the sale of an article embodying the invention. His monopoly remains so long as he retains the ownership of the patented article. But the sale of it exhausts the monopoly in that article and the patentee may not thereafter, by virtue of this patent, control the use or disposition of that article.

*DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, Inc.*, 96 C 50112, 2001 WL 92118, at *9 (N.D. Ill. 2001) (emphasis in original) (quoting *United States v. Univis Lens Co., Inc.*, 316 U.S. 241, 250 (1942)). "The *unrestricted* sale of a patented article, by or with the authority of the patentee, 'exhausts' the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold." *Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc.*, 283 F. Supp.2d 1018, 1032 (N.D. Iowa). Exhaustion of the patent right depends on "whether or not there has been such a disposition of the article that it may fairly be said that the *patentee* has received his reward for the use of the article." *DeKalb Genetics Corp.*, 2001 WL 92118, at *9 (quoting *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942).

Although the unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device, the sale of patented goods can be conditioned. *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 706 (Fed. Cir. 1992). Further, the exhaustion principle does not turn a conditional sale into an unconditional one. *Id.* Thus, where something less than all of the rights in the patent have been sold to a buyer, "[t]he price paid by the purchaser 'reflects only the value of the 'use' rights conferred by the patentee.' and the 'first sale' or 'patent exhaustion' rule does not apply." *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002) (quoting *B. Braun Med. v. Abbott Labs.,* 124 F.3d 1419, 1426 (Fed. Cir. 1997) ("This exhaustion doctrine, however, does not apply to an expressly conditional sale or license.")).

The Court finds that the patent exhaustion rule does not apply in the present case, as

Schofield conditioned the license to National as non-transferrable.  Even if the patent exhaustion rule did apply, the Court finds that there are genuine issues of material fact concerning whether Schofield received benefits constituting compensation under the National license agreement.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant United States Steel Corporation's Motion for Partial Summary Judgment to Limit Potential Damages [DE 46].

SO ORDERED this 31st day of March, 2006.

> s/ Paul R. Cherry
> MAGISTRATE JUDGE PAUL R. CHERRY
> UNITED STATES DISTRICT COURT

cc:   All counsel of record